# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

_____

D.J. (DARUS) FINKE and SHEA FINKE,
husband and wife,

                Plaintiffs,

v.                           **MEMORANDUM OF LAW & ORDER**
                           Civil File No. 07-4267 (MJD/RLE)

HUNTER'S VIEW, LTD. and
WAL-MART STORES,
INCORPORATED,

                Defendants.

_____

Blake W. Duerre, Mark S. Brown, Paul E. D. Darsow, and Christopher D. Newkirk, Arthur Chapman Kettering Smetak & Pikala, PA, Counsel for Plaintiffs.

Aaron M. Ponce and Thomas A. Harder, Foley & Mansfield, PLLP, Counsel for Defendant Hunter's View, Ltd.

Lawrence M. Rocheford, Leonard J. Schweich, and Elisa M. Hatlevig, Jardine Logan & O'Brien, PLLP, Counsel for Defendant Wal-Mart Stores, Incorporated.

_____

## I. INTRODUCTION

This matter is before the Court on Plaintiffs' Motion to Exclude Experts L.J.

Smith and Nathan Dorris and for Partial Summary Judgment [Docket No. 35];

Defendant Wal-Mart Stores, Incorporated's Motion for Summary Judgment

[Docket No. 39]; and Defendant Hunter's View, Ltd.'s Motion to Exclude Certain

Expert Testimony and for Summary Judgment [Docket No. 46].  The Court heard

oral argument on November 24, 2008.

## II.    BACKGROUND

### A.    Factual Background

#### 1.    The Parties

Plaintiffs D.J. (Darus) Finke ("Finke") and his wife, Shea Finke, are citizens

of Minnesota, and residents of Marble, Minnesota.

Defendant Hunter's View, Ltd., ("Hunter's View") was a company that

sold deer stands.  Hunter's View filed for bankruptcy in 2005 and was subject to a

Chapter 7 liquidation.  According to David Raymond Smith, CEO, owner, and

sole shareholder of Hunter's View, the liquidation is complete.

Defendant Wal-Mart Stores, Incorporated ("Wal-Mart") is in the retail

business and, among other things, sells hunting accessories such as deer stands.

#### 2.    Hunter's View Eagle Climbing Stand

Finke claims that he was injured due to defects in the Hunter's View Eagle

Climbing Stand (Model HV ATC-4000) ("the Tree Stand").  The Tree Stand is

2

portable and permits a hunter to climb a tree with the stand.  The Tree Stand is

composed of a seat, a platform, and a safety harness, along with a series of quick

clip pins, straps, and adjustment arms designed to allow its user to attach the

stand to a tree and then begin a process of moving up the tree to the desired

height.  The connection cables loop around the tree and attach the seat and the

platform to the tree.  The braided wire connection cables are sheathed in rubber.

The end of each connection cable contains a loop, which is formed by a swage

fitting.  A quick clip pin attaches the cable to the seat and platform sections,

holding the stand against the tree.

     The user connects the platform section or the seat section of the Tree Stand

to the tree by inserting the connection cable into either tube of the platform or

seat section.  The user inserts the quick clip pin into one of the pre-drilled holes

on the top of the adjustment arm tube of the platform section, through the

connection cable loop, and out of the corresponding hole on the bottom of the

adjustment arm tube.  The user then wraps the cable around the tree and secures

the other adjustment arm tube of the platform or seat section in the same manner.

     According to the product manual for the Tree Stand, the user then attaches

a safety harness to the tree above the user's head and steps onto the platform

section.  Facing the tree, the user inserts his feet into the nylon bootstraps

attached to the platform section.  The user sits on the seat section and lifts his feet

to raise the platform section.  The user next stands on the platform section and

raises the seat section.  The user repeats this process until he reaches his desired

height.  Then, he adjusts the seat section to a comfortable sitting level.

### 3.      The Accident

On November 12, 2005, Finke was hunting in Itasca County, Minnesota,

while using the Tree Stand.  According to Finke, he purchased the Tree Stand

from a Wal-Mart Store in Grand Rapids, Minnesota in July or August of 2002.

While it was still dark, Finke used the Tree Stand to climb 30 feet up a tree.  He

had not tethered the Tree Stand's safety harness to the tree.  According to Finke,

while he was adjusting the seat section, standing on the platform, the cable

disengaged from the left adjustment arm tube of the seat section.  He lost his

balance and fell to the ground.

Finke fired distress shots and his brother, Justin Finke, came to his aid.

Justin Finke testified that he saw both quick clip pins still correctly inserted

through the adjustment arms of the seat section with the safety clips engaged.

Finke testified that the connection cable on the left side of the seat section was not

attached and the cable loop was intact.

Finke suffered serious and permanent injuries as a result of the fall.  He

sustained a C6-7 fracture and C6 burst fracture with complete transverse cord

injury and paraplegia from the sternum down.

### 4.    Theories Regarding Causation of the Accident

The deposition testimony and expert opinions currently before the Court

present two main theories as to how the accident occurred.  According to Finke,

he did not remove the quick clip pin once he reached his desired height in the

tree.  Instead, Finke believes that he had placed the swage behind the quick clip

pin so that the swage was wedged by the pin.[1]  The wedged swage held Finke's

weight as he ascended the tree, until it released once he reached the top of his

climb, leaving the pin still inserted through the holes in the seat rail.

None of the experts could reproduce the wedged-swage scenario in testing.

The experts for both Plaintiffs and Defendants agree that the probable scenario is

---

[1]Although, at some points, the parties and experts express this scenario by stating that the pin was wedged behind the swage, both manners of wording are attempting to express the same scenario: the loop and the swage were in the tube, the pin was not through the loop, but the swage and loop were blocked from sliding out of the tube by the inserted pin.  For clarity and consistency, the Court will describe this scenario as the scenario in which the swage was wedged behind the pin.

that Finke correctly inserted the quick clip pins through the loops before climbing

the tree.  Upon reaching the top of his climb, Finke removed one quick clip pin

from the seat portion to readjust the length of the cable.  He reinserted the quick

clip pin, but did not place the pin through the cable loop – he did not insert the

loop far enough into the tube – and the seat section released from the tree.

### B.     Procedural Background

According to Hunter's View, on July 25, 2007, D.J. Finke and his wife, Shea

Finke, commenced this lawsuit against Hunter's View in Minnesota state court.

This original Complaint has not been provided to the Court.  Based on the

evidence in the record before this Court, this action was commenced in

Minnesota state court in September 2007 when Plaintiffs filed an Amended

Complaint against both Defendants.  On October 16, 2007, Wal-Mart removed

this case to federal court.  On October 24, 2007, Hunter's View joined the

removal.

The Amended Complaint alleges Count One: Strict Liability; Count Two:

Negligence; and Count Three: Breach of Warranty, all against both Defendants.

All three parties have now filed motions before this Court seeking to

exclude experts and seeking full or partial summary judgment.  The Court first

6

addresses the parties' arguments regarding expert witnesses.  The Court then

addresses the requests for summary judgment.

## III.   DISCUSSION

### A.   Motions to Exclude Expert Testimony

#### 1.   Standard

##### a.   Rule 702

The admissibility of expert testimony is governed by Federal Rule of

Evidence 702.  The proponent of the testimony has the burden to show by a

preponderance of the evidence that the testimony is admissible under Rule 702.

Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir. 2001).  Under the Rule:

> If scientific, technical, or other specialized knowledge will assist the
> trier of fact to understand the evidence or to determine a fact in
> issue, a witness qualified as an expert by knowledge, skill,
> experience, training, or education, may testify thereto in the form of
> an opinion or otherwise, if (1) the testimony is based upon sufficient
> facts or data, (2) the testimony is the product of reliable principles
> and methods, and (3) the witness has applied the principles and
> methods reliably to the facts of the case.

Fed. R. Evid. 702.

"Under the framework developed in Daubert, trial courts must serve as

gatekeepers to insure that proffered expert testimony is both relevant and

reliable.  Trial courts are given broad discretion in fulfilling this gatekeeping role

. . . ."  Wagner v. Hesston Corp., 450 F.3d 756, 758 (8th Cir. 2006) (citations

omitted).  The proposed testimony must be useful to the factfinder in deciding

the ultimate fact issue; the expert witness must be qualified; and the proposed

evidence must be reliable.  Lauzon, 270 F.3d at 686.

When considering the reliability and relevance of expert testimony, the

Court may examine "whether the theory or technique is subject to testing,

whether it has been tested, whether it has been subjected to peer review and

publication, whether there is a high known or potential rate of error associated

with it, and whether it is generally accepted within the relevant community."

Unrein v. Timesavers, Inc., 394 F.3d 1008, 1011 (8th Cir. 2005) (citation omitted).

The Court's inquiry is "flexible and fact specific."  Id.

> As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.  Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded.

Bonner v. ISP Techs., Inc., 259 F.3d 924, 929-30 (8th Cir. 2001) (citation omitted).

## b.   Cumulative Testimony

8

Federal Rule of Evidence 403 states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Under Rule 403, "a Court may limit or exclude expert testimony which is cumulative."  Upsher-Smith Labs. Inc. v. Mylan Labs, Inc., 944 F. Supp. 1411, 1440 (D. Minn. 1996) (citations omitted).

### c.     Reasonable Alternative Design

> Minnesota . . .  maintains the requirement in a strict liability
> products case that a plaintiff must establish not only that the product
> was in a defective condition, but also that it was unreasonably
> dangerous.  Obviously, a factor bearing upon the latter requirement
> will be the existence or nonexistence of a feasible alternative design.
> To satisfy that requirement, the plaintiff ordinarily has the burden of
> showing the existence of an alternative design that was safer.

Kallio v. Ford Motor Co., 407 N.W.2d 92, 96 (Minn. 1987) (citations and footnote omitted).  "Although normally evidence of a safer alternative design will be presented initially by the plaintiff, it is not necessarily required in all cases.  Such evidence is relevant to, and certainly may be an important factor in, the determination of whether the product was unreasonably defective.  However, existence of a safer, practical alternative design is not an element of an alleged

defective product design prima facie case." Id. at 96-97 (footnote omitted).

While Minnesota substantive design-defect law does not require proof of a feasible alternative design in all cases, the Court also examines whether, under Daubert, an expert's opinion regarding proposed safety modifications is reliable and relevant. Daubert does not require that an expert manufacture a new prototype to test a suggested alternative design. Unrein, 394 F.3d at 1012. However, an expert who proposes safety modifications should at least prepare a drawing of how the modification could be integrated into the product at issue or "present photographs showing its use with similar machines." Id. (citation omitted). Moreover, "[a]n expert proposing safety modifications must demonstrate by some means that they would work to protect the machine operators but would not interfere with the machine's utility." Id. (citing Jaurequi v. Carter Mfg. Co., 173 F.3d 1076, 1084 (8th Cir.1999); Peitzmeier v. Hennessy Indus., Inc., 97 F.3d 293, 297 (8th Cir. 1996)). When an expert is proposing that the product should be taken off the market entirely, not modified, then "feasibility or compatibility" are not concerns and the expert need not demonstrate a reasonable alternative design. Id.

**2.   Gary M. Bakken**

Defense expert, Gary M. Bakken, Ph.D., C.P.E., has a B.S.E. in mechanical engineering (astronautical), a M.S. in safety, and a doctorate in industrial engineering (human factors/ergonomics).  He has varied educational and work experience, including providing design recommendations in the areas of products and warnings and conducting incident causation analysis.

Bakken tested an exemplar climbing tree stand and concluded that, if the swage was wedged behind the quick clip pin, the cable loop would not have passed through the quick clip pin causing the accident.  In fact, during testing, the cable broke before the swage and cable loop passed the pin, at a weight much larger than the weight involved in the accident.  Bakken opines that Finke attempted to adjust the seat of the Tree Stand after he was 30 feet up the tree by removing the quick clip pin from the armrest adjustment tube.  Bakken concludes that Finke mistakenly thought that he had properly re-engaged the pin through the cable loop, but, instead, the loop was not around the pin.  He concludes that Finke released the seat platform, it dropped, and Finke lost his balance and fell off of the foot platform to the ground.

Bakken opines that it was reasonable to expect that Finke was aware of the danger he created by not using the tether; that it was reasonably foreseeable that

11

Finke was aware of the risk from not using the tether and removing the pin while up the tree; and that Finke failed to use the care that a reasonably prudent and careful person would in a similar situation.

Bakken also provides criticism of the opinions of Plaintiffs' expert witnesses. Among other things, Bakken criticizes the opinion of Plaintiffs' expert Carol Pollack-Nelson, that the on-product warning label is defective because of its placement and small print.

### 3.   Nathan Dorris

#### a.   Summary of Dorris's Opinion

Defense expert witness Nathan Dorris, Ph.D., C.P.E., has a B.S. in management, an M.S. in industrial and systems engineering, and Ph.D. in industrial and systems engineering. His areas of expertise include product safety and the evaluation of instructions and warnings.

In his report, Dorris opines, among other things, that the Tree Stand is a reasonably safe design and that the Tree Stand quick clip locking mechanism provides appropriate user feedback regarding its proper use. He also opines regarding the safety of the chest harness. Dorris spends a substantial portion of his report analyzing the warnings associated with the Tree Stand and the

necessity of additional warnings.  He concludes that the warning system

included with the Tree Stand was reasonable, appropriate, and adequate.  Unlike

Bakken, Dorris analyzes the adequacy of the written instruction manual that

accompanied the Tree Stand.

### b.    Whether Dorris's Opinions Are Cumulative

Plaintiffs argue that Dorris should be excluded because his testimony

duplicates that of Bakken.  In support of their argument for exclusion, Plaintiffs

note that Bakken and Dorris have similar educational backgrounds.  Both

experts' fields of studies include warnings and product safety.  In their reports,

both experts offer overlapping opinions, such as overlapping causation opinions

and the safety of the Tree Stand's design.  Both experts also opine that the

warnings were adequate.  Plaintiffs posit that, given Bakken's background,

Bakken could have offered in-depth testimony on the product warnings instead

of Dorris.

Defendants assert that the undergraduate degrees and work experience of

Bakken and Dorris differ significantly.  They argue that Bakken and Dorris are

specialized in different fields within the discipline of industrial engineering.

Defendants contend that Bakken will testify about testing he performed on

an exemplar stand to refute Finke's testimony of how the accident occurred.

Additionally, Bakken will testify about the force and manipulation necessary to

improperly wedge the swage behind the pin, Finke's danger awareness while

using the product, and Finke's interaction with the stand cable attachment.

Defendants claim that, in contrast, Dorris will testify about the adequacy

and effectiveness of the warnings as well as the behavioral responses to the

warnings.  Defendants assert that the overlap between the experts' reports

resulted from the experts' attempt to provide the broadest base for their opinions

so Plaintiffs would be aware of all information they considered to render their

respective opinions.  Defendants represent that at trial, however, the experts'

opinions will be narrowly tailored to avoid cumulative testimony.

Furthermore, Defendants argue that although Bakken might otherwise be

qualified to offer opinions on the warnings, he did not fully review the warnings.

Defendants conclude that Plaintiffs cannot dictate the manner in which

Defendants decide to present their evidence.  Defendants do not wish to have

Bakken testify on the topic of warnings.

###### c.    Conclusion

Bakken's report does contain a cursory analysis of the Tree Stand's

on-product warnings.  Dorris provides a more in-depth analysis of the

on-product warnings and also provides an analysis of the instruction manual

warnings, which are referenced in the on-product warning.  There is overlap

between Bakken's report and Dorris's report regarding warnings.  However,

Defendants represent that Dorris, not Bakken, is the warnings expert.  In

accordance with the Court's power to limit cumulative testimony under Rule 403,

the Court holds that, during trial, only Dorris may opine on the adequacy of the

Tree Stand's on-product and manual warnings.  Bakken may not opine regarding

the adequacy of the warnings.

Dorris's report contains analysis and opinions regarding other features of

the Tree Stand, such as the safety of the chest harness and the design of the quick

clip locking mechanism.  These matters are also contained in Bakken's report.

Defendants represent that only Bakken will opine on these matters.  Based on the

Court's power to limit cumulative testimony under Rule 403, the Court holds

that, during trial, Dorris may only opine regarding the adequacy of the Tree

Stand's warnings.  He may not express an expert opinion regarding other issues,

such as the design of the quick clip mechanism, the causation of the accident, or

the chest safety harness.  Of course, in order to opine on the warnings, where

15

necessary, Dorris may state that he relies upon Bakken's opinions.  However, Dorris may not, himself, issue any opinions beyond those related to the adequacy of the Tree Stand's warnings.

### 4.    Larry Hanke

Defense expert, Larry D. Hanke, P.E., is a metallurgical engineer.  Hanke examined the Tree Stand in order to determine if the physical condition of the Tree Stand was consistent with Plaintiffs' theory of the accident.  He opined that the cables and frame of the Tree Stand were in good condition.  He also opined that if the swage had been wedged behind the pin and then pulled out past a properly inserted pin, the swage and the frame would be deformed.  Hanke concluded that there was no physical evidence that the accident occurred by the swage being wedged behind the pin.

### 5.    Lorne ("L.J.") Smith, Jr.

### a.    Summary of Smith's Opinion

Defense expert, Lorne ("L.J.") Smith, Jr , has an A.A. in police science and a B.S. in criminal justice.  He has extensive experience in hunter training and was the Hunter Safety Administrator for the Mississippi Department of Wildlife, Fisheries and Parks for ten years.

16

Smith opines, among other things, that the Tree Stand was altered; that the Tree Stand's platform had been misused for years; that the tether of the safety harness is of a length that, while tethered to the tree, it will not get in the way of the user while climbing; that Finke would not have fallen if he had worn the safety harness; that a common sense user would interpret the Tree Stand's warnings to know that the harness must be attached to both the tree and the user's body; that Finke's failure to follow product warnings caused the accident and injuries; and that Thomas Crane's and Pollack-Nelson's opinions are deficient for various reasons.

### b.    Whether Smith's Opinions Are Cumulative

Plaintiffs argue that Smith should be excluded because his proposed testimony duplicates the proposed testimony of Bakken and Dorris.  For example, Smith's opinions in the fields of industrial engineering, human factors, human interaction, product warnings, and causation are duplicative of opinions by Bakken and Dorris.

Defendants assert that Smith offers unique, non-cumulative testimony. They claim that Smith will demonstrate the use and operation of the Tree Stand, and his observations of the tree used by Finke and the surrounding area.

Defendants also assert that Smith will testify about hunter safety, hunting product industry practices, and safety issues.  According to Defendants, his testimony will be limited to these areas at trial.

Smith's report contains many opinions that repeat the opinions of Bakken and Dorris.  Defendants admit that Smith gives cumulative opinions that are outside his area of expertise.  The Court holds that Smith's testimony regarding causation, the design of the Tree Stand, the design of the safety harness, and the adequacy of the warnings are all excluded as cumulative.

> **b.** **Whether Smith Is Qualified Under Rule 702 to Offer Testimony**

Plaintiffs argue that Smith should be excluded because he is not a human factors or engineering expert, but offers his opinion in these areas.  The Court has already held that Smith is not permitted to testify in the areas of human factors or engineering because his testimony in those areas is cumulative.  The Court also holds that Smith is not qualified to testify in those areas.

Additionally, Plaintiffs contend that Smith should not be permitted to testify because some of his opinions are based on common sense or are unsubstantiated.  The first example that Plaintiffs cite is Smith's statement that it

is "common sense" for a hunter to wear a safety harness and attach it to the tree.

(Smith Reports at 6.)  Plaintiffs argue that if it is common sense, then the jury

does not require the specialized knowledge of an expert witness.  The Court

agrees that Smith is not allowed to testify regarding general common sense.

However, based on his extensive experience, Smith is qualified as an expert in

hunter safety.  See Fed. Crop Ins. Corp. v. Hester, 765 F.2d 723, 728 (8th Cir. 1985)

("A witness's practical experience can be the basis of qualification as an expert.")

(citations omitted).  If the purpose of Smith's testimony is to explain what is

common practice and knowledge to a hunter and explain the issue from the point

of a hunter and hunting safety expert, this would constitute an expert opinion

which Smith is qualified to give.

The second example that Plaintiffs cite is Smith's critique of Plaintiffs'

expert Pollack-Nelson's opinion in which Smith claims that "[i]t is well

documented that far more hunters have died from not wearing a harness," yet

does not cite any basis for this assertion.  This opinion is completely

unsubstantiated and, therefore, lacks reliability.  The Court holds that Smith

cannot give this opinion at trial.

Finally, Plaintiffs argue that Smith's criticism of the scientific methodology

employed by a survey from <u>Deer and Deer Hunting</u> relied upon by

Pollack-Nelson is unsupported and constitutes mere speculation.  Smith asserts

that the survey is not scientific and that hunters who had accidents were more

likely to respond to the survey than hunters who had not had accidents.

Defendants note that Smith served on the Treestand Manufacturers Association

committee to evaluate the data supporting the petition which was submitted to

the Consumer Products Safety Commission by Pollack-Nelson.   Smith's report

confirms that he spent many days reviewing hunter accident data while on that

committee.  While Smith does have some experience evaluating hunting stand

safety data, there is no evidence before the Court that he has any special

education, experience, or training to qualify him to evaluate the methodology of

the <u>Deer and Deer Hunting</u> survey.  Smith's testimony on that point is excluded.


    The Court concludes that Smith is not qualified to testify regarding

engineering, product design, or the reliability of survey evidence.  Smith is

qualified to testify about hunter safety, hunting product industry practices, and

safety issues.  He will be allowed to demonstrate the use of the Tree Stand.  Smith

will be permitted to testify regarding Finke's assertion that he did not tether his

harness to the tree out of concern that the tether would become pinched in the

teeth of the tree stand.  Based on his knowledge of the hunting stand market,

Smith will also be allowed to testify regarding when alleged alternative designs

became available on the market, as well as the alleged fact that designs similar to

Hunter's View's design remain on the market now.  Smith is also permitted to

testify regarding his observations of the tree from which Finke fell.  Overall, his

trial testimony will be limited to hunter safety, hunting product industry

practices, and safety issues.

### 6.    Thomas Crane

### a.    Summary of Crane's Expert Opinion

Plaintiffs' expert, Thomas R. Crane, P.E., is a mechanical engineer.  Crane

examined the Tree Stand, other Hunter's View deer stands, and other similar

deer stands.  He also reviewed discovery evidence from this case and met with

Finke.  Crane tested an exemplar Hunter's View climbing tree stand to evaluate

what would occur if the swage was wedged behind the pin.  Crane could not

replicate the type of failure Finke believes occurred.  Crane opined that he could

not rule out the possibility that Finke's scenario occurred, but testified that, based

on the physical evidence, he did not believe that the accident could have

happened that way.

Crane opines that there are two possible explanations for the failure of the Tree Stand.  In the first scenario, based on Finke's recollection, Finke put the locking pin in front of the swage, instead of through the cable loop, during his initial assembly before he climbed the tree.  The swage was wedged by the pin such that Finke was supported as he climbed the tree, but when he reached the top of the tree, it released completely and the stand released, causing the accident.

In the second scenario, which Crane opines is probable, Finke climbed to the top of the tree and then chose to adjust the length of the seat cable by releasing and resetting the cable.  When he reset the cable, Finke thought that the pin was locked through the cable loop.  However, the pin was not placed through the loop, and the seat cable released from the tree.  Crane opines that it is foreseeable that a hunter would choose to adjust the seat securing cable at the top of the tree, and notes that there is no way to adjust the cable length to accommodate a change in tree diameter without removing the pin and cable and replacing the pin into different lock holes.  Crane opines that the Tree Stand is defective and unreasonably dangerous because the locking mechanism for the

quick clip pin is not visible to the user, as it is in multiple competing brands of

deer stands.

### b.    Admissibility of Opinion Regarding the First Scenario

Defendants assert that Crane's opinion regarding the first scenario, which

comports with Finke's theory of how the accident occurred, is so fundamentally

unsupported that it offers no assistance to the jury.  Crane's own testing

eliminates the first scenario as a plausible explanation.  Crane testified that there

might be some way for the first scenario to have occurred, but has offered no

explanation.  Crane's testimony regarding the first scenario is, therefore, pure

speculation.  The reasoning underlying Crane's opinion regarding the first

scenario has no scientifically valid reasoning.  Crane is relying upon the

testimony of Finke.  Finke is permitted to testify regarding his recollection, but

Crane offers no helpful expertise by merely repeating Finke's theory.  The testing

performed by experts for both Plaintiffs and Defendants demonstrated that if the

cable loop was not properly engaged and the swage fitting was wedged behind

the pin, the cable would break before the swage became disengaged.

Furthermore, it is undisputed that the swage fittings and tube on the Tree Stand

were undamaged.

The Court concludes that any testimony by Crane that the first scenario occurred is unreliable and unhelpful.  Crane's opinion regarding the first scenario was tested, but was not supported by his testing.  There is no evidence of peer review or publication regarding the possibility of the first scenario.  Nor is there evidence of general acceptance in the relevant community of the possibility of the first scenario.  Finally, Crane has no explanation of how the first scenario could have occurred.

### c.    Admissibility of Opinion Regarding the Second Scenario

Defendants argue that Crane's opinion regarding the second scenario for how the accident occurred is inadmissible because it disregards Finke's deposition testimony and relies on Crane's own speculative theory about how the accident could have happened.  However, Crane's own theory is not speculative.  It is based on his examination of the physical evidence and, in fact, is in accord with the theory of the defense experts.

The Court holds that Crane's expert opinion is not inadmissible simply because his second scenario is in conflict with Finke's personal belief about what happened during a sudden and traumatic accident.  There is no requirement that Crane is bound by Finke's testimony – particularly when experts on both sides

conclude that Finke is mistaken in his version of events.  An expert need not agree with the fact testimony of a party.  Lauzon v. Senco Prods., Inc., 270 F.3d 681, 696 (8th Cir. 2001).  In fact, "the independence of [Crane's] testimony is demonstrated by its seeming contradiction with that of [Finke]."  Id. at 692 (citation omitted).  Crane arrived at his opinion through the careful use of his unquestioned expertise, his examination of the Tree Stand, and his scientific testing.  The jury will address the accuracy of Finke's recollection of the accident. As in Lauzon, "[a] jury could readily find that [Finke]'s recollection may have been clouded by the suddenness of the accident."  Id. at 695 n.8.

Having arrived at his well-supported causation opinion, that Finke incorrectly thought that he had inserted the pin through the loop while at the top of the tree, Crane was then legitimately able to opine that the Tree Stand was defectively designed because it did not alert the user whether the quick clip pin was properly inserted through the cable's loop.  Based on Crane's second scenario, he opines that the absence of a visual confirmation from the locking system contributed to the accident.  Thus, his opinion that the Tree Stand's locking system was defectively designed is relevant and reliable.

### d.    Opinion Regarding Alternative Design for Cable

## Adjustment

Defendants assert that Crane's opinion that the Tree Stand was unreasonably dangerous because it did not allow the user to adjust the cable length without detaching the cable is inadmissible.  He opines that "[a] safe and efficacious method of adjusting the girth length of the cables would obviate the need for the user to choose between climbing down and back up or disconnecting the cable while elevated." (Crane Report at 5.)  Crane has not sketched, designed or constructed a mechanism that would allow for adjustment of the cable while up a tree without detaching the cable.  There is no evidence that Crane tested such a proposed alternative design.  He has not identified any existing products that use such an alternative design and cites no peer reviewed literature to support his criticism of that aspect of the Tree Stand design.  In contrast, Crane testified regarding five exemplars from competing brands that contained the visual locking mechanism that he recommends.

As previously noted, an expert who proposes safety modifications to a product must demonstrate by some means, whether by a drawing, reference to exemplars, or some other manner of explanation, that the proposed modification would protect the user without interfering with the product's utility.  See, e.g.,

26

Unrein, 394 F.3d at 1012.  Because Crane makes no attempt to explain how his proposed modification of the cable system to allow adjustment without unlocking would work, the Court excludes his testimony regarding that proposed modification.

### 7. Carol Pollack-Nelson

#### a. Summary of Pollack-Nelson's Expert Opinion

Plaintiffs' expert Carol Pollack-Nelson, Ph.D., a human factors psychologist, opines regarding the design of the Tree Stand, the foreseeability of Finke's failure to wear the safety harness, the adequacy of the design of the safety harness, and the adequacy of the warnings.  She opines that the Tree Stand was defectively designed because it did not permit Finke to visually see whether the quick clip pin was properly engaged, giving him a false sense of security.  She also opines that the on-product safety warnings were inadequate and improperly placed so that it was difficult for someone in Finke's position to read them. Finally, she opines that the Tree Stand's chest safety harness was inadequate.

#### b. Opinion Regarding False Secure

Defendants dispute the relevancy of Pollack-Nelson's opinion that the Tree Stand was defectively designed because it allowed a false secure when the swage

was wedged behind the pin.  Pollack-Nelson could not recall if she was able to

wedge the swage behind the pin.  She did not analyze the amount of weight that

the Tree Stand could bear if the swage was wedged in that position.  She

admitted that Crane has the more appropriate credentials to do a mechanical test

to evaluate the load strength of the Tree Stand's cable.

Also, Pollack-Nelson opines that the Tree Stand should have been

designed differently so that the connection was visible, but does not have any

particular design in mind because she does not "do designing of products."

(Pollack-Nelson Dep. 96.)

Pollack-Nelson also opined that if Finke had not engaged the quick clip pin

at all in front of the swage or through the loop, then the Tree Stand would not

have stayed up in the tree and there would be no resistance.  Defendants assert

that, therefore, the false secure theory is not tenable.

The Court agrees that, based on Pollack-Nelson's own testimony, she is not

qualified to give an opinion regarding whether this accident occurred on the

ground or up the tree.  However, her opinion regarding the false secure that

could occur due to the lack of a visual locking system is relevant.  Pollack-Nelson

testified that whether the user received a false secure while on the ground or

disengaged the quick clip while at the top of the tree, because the quick clip-loop

connection is a critical component, there should still be some sort of visual

confirmation that the connection has been correctly made.  Additionally,

Defendants' objection to her opinion that, based on Finke's recollection of the

event, he received a false secure while climbing the tree, is an objection to the

factual basis for her opinion.  Generally, the factual basis of an expert's opinion

goes to the credibility of the expert's testimony, not the admissibility of the

testimony.  Any weaknesses or inconsistencies in her testimony on this matter

will be subject to vigorous cross examination.

As to Pollack-Nelson's lack of an alternative design for a locking

mechanism with a visual confirmation, the Court agrees that Pollack-Nelson

cannot suggest a safety modification without some sort of explanation as to how

it would work with the product at hand.  In contrast, Crane has provided

exemplars of visually confirming locking mechanisms.  However, as a human

factors psychologist, Pollack-Nelson is qualified to testify regarding a user's

general need for confirmation by multiple senses, particularly vision, in a critical

component.

### c.   Opinion Regarding Safety Harness

Pollack-Nelson opines that the chest harness that Hunter's View provided with the Tree Stand was inadequate and inconvenient and that Hunter's View should have provided a full body harness.  She reasons that a chest harness allows for asphyxiation if a user falls and hangs while wearing the chest harness, while a full body harness substantially reduces the risk of asphyxiation.

Defendants argue that Pollack-Nelson's opinions regarding an alternative harness design are irrelevant because Finke admitted that he did not tether the harness.  Defendants claim that whether or not there was an alternative design would not have prevented the accident, so there is no causal connection between any potential deficiency in the Tree Stand's harness and Finke's injury.

Pollack-Nelson's recommendation for a full body harness is relevant because her opinion directly responds to Bakken's opinion that Finke assumed a risk of injury by not using the chest safety harness as directed by the product manual.  Pollack-Nelson's testimony supports Plaintiffs' argument that Finke's failure to use the harness as directed was a foreseeable misuse of the product.  Pollack-Nelson's opinion explains why a user in Finke's position would choose to ignore Hunter's View's warning and not use the chest safety harness.

### d.    Opinion Regarding Adequacy of the Warnings

Defendants note that Pollack-Nelson's report makes no reference to the warnings in the Tree Stand's instruction manual.  She testified that she offered no opinions on the adequacy of those instructions because Finke did not have the manual with him at the time of the accident and because he testified that he read and understood the manual.  She also testified that the manual's warning to not remove the quick clips while on the tree was clear.  Finke testified that the Tree Stand's warning regarding wearing the harness was clear.

Defendants also argue that Pollack-Nelson's opinions regarding inadequate warnings fail because she fails to provide alternative warnings and did not testify that other manufacturers use better warnings.

The Court holds that Pollack-Nelson's opinions regarding the adequacy of the on-product warnings are admissible.  Pollack-Nelson does specify where an adequate label should be located and what information should be included in the on-product warning – that the harness should be tethered during climbing, hunting, and descending.  Any weaknesses in her opinions based on her failure to address the warnings in the Tree Stand's manual and on her lack of detail in describing a more adequate warning can be addressed during cross examination.

**e.     Opinion Regarding Foreseeability of Finke's Actions**

Pollack-Nelson opines that, if Finke unlocked the pin to adjust the seat cable while he was in the air, that was a foreseeable misuse of the Tree Stand. Defendants argue that this opinion is speculative because Pollack-Nelson testified that she was not aware of anyone sustaining an injury from intentionally removing a locking pin from a hunting stand while up a tree.

Pollack-Nelson's opinion is not speculative. She based her opinion on her own experience with portable tree stands and the fact that trees generally taper as the user climbs. If the user does not correctly estimate the taper, the seat portion of the stand may be unsafely sloped once the user reaches the desired height. Pollack-Nelson reasons that it is foreseeable that a user will not then return to the ground to readjust the cable and climb the tree again, but will, instead, stand on the platform and detach the seat and attempt to readjust it while on the tree. Defendants can test Pollack-Nelson's theory through cross examination.

### B.    Motions for Summary Judgment

#### 1.    Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine issue as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue

of material fact.  <u>Celotex</u>, 477 U.S. at 323.  Summary judgment is only appropriate

when "there is no dispute of fact and where there exists only one conclusion."

<u>Crawford v. Runyon</u>, 37 F.3d 1338, 1341 (8th Cir. 1994) (citation omitted).

### 2.    Whether Wal-Mart Sold the Deer Stand

Wal-Mart claims that Plaintiffs cannot prove that Wal-Mart sold the Tree

Stand at issue in this case.  Wal-Mart notes that "[a] plaintiff may not merely

point to unsupported self-serving allegations, but must substantiate his

allegations with sufficient probative evidence that would permit a finding in his

favor."  <u>Bass v. SBC Commc'ns, Inc.</u>, 418 F.3d 870, 872-73 (8th Cir. 2005) (citation

omitted).  Wal-Mart claims that the evidence presented by Plaintiffs consists

merely of Finke's unsupported allegation that he bought the Tree Stand at

Wal-Mart.

Finke claims that he bought the Tree Stand at the Wal-Mart located in

Grand Rapids, Minnesota sometime in July or August 2002.  According to Finke,

he paid approximately $100 for the deer stand.  He admits that he no longer has a

receipt of his purchase.  Finke does claim to have in his possession check registers

from the relevant time period written out to Wal-Mart for approximately $100.

Justin Finke testified that he bought his Hunter's View tree stand, which is

a different model than the Tree Stand in this case, at Wal-Mart because, before the

accident occurred, D.J. Finke told him that he bought his Tree Stand at Wal-Mart.


Wal-Mart asserts that it never sold, marketed or distributed the HV

ATC-4000 Eagle model tree stands manufactured by Hunter's View.  Wal-Mart

relies upon the affidavit Jim Scantlin, Wal-Mart's Senior Director of Enterprise

Information Management.  Scantlin avers that he reviewed Wal-Mart's business

records and the records reflect that Hunter's View did not supply the HV ATC-

4000 Eagle tree stand to Wal-Mart.  The records do reveal that Hunter's View did

supply a number of other tree stand models to Wal-Mart.  Hunter's View does

not dispute Wal-Mart's assertion that Hunter's View did not sell the Eagle model

tree stand to Wal-Mart.  From this evidence Wal-Mart concludes that it is

impossible for Finke to have purchased the Tree Stand from Wal-Mart.

The Court denies summary judgment on the issue of whether Wal-Mart

sold the Tree Stand to Finke.  Plaintiffs have submitted admissible evidence that

Finke purchased the stand from Wal-Mart – Finke's own testimony and the

corroborating testimony of his brother regarding Finke's prior consistent

statement that Finke purchased the Tree Stand at Wal-Mart, made before he had

an incentive to be untruthful about the source of the Tree Stand.  Moreover,

Wal-Mart admittedly sold some Hunter's View products and the testimony from

Hunter's View representatives regarding their sales to Wal-Mart are far from

certain.  Plaintiffs have submitted more than unsupported, self-serving

allegations to support their claim that Finke purchased the Tree Stand from Wal-

Mart.  Either Wal-Mart is mistaken or Finke is mistaken.  The dispute between

Plaintiffs and Wal-Mart is precisely the type of genuine issue of material fact that

must be decided by the factfinder.

### 3.     Non-Manufacturer Liability for Strict Liability Claim

Wal-Mart argues that, even if Finke purchased the Tree Stand at its store,

his strict liability claims fail as a matter of law because Hunter's View is able to

satisfy any judgment against it and Wal-Mart did not participate in the design or

manufacture of the stand.

### a.     Standard

Under Minnesota law, non-manufacturers are generally not held strictly

liable for the sale of defective products.  As applicable in this case, in order to

maintain a strict liability claim against a non-manufacturer seller of a defective

product, a plaintiff must establish "that the manufacturer is unable to satisfy any

judgment as determined by the court."  Minn. Stat. § 544.41, subd. 2(d).  "The

seller's-exception statute, Minn. Stat. § 544.41, tempers the harsh effect of strict

liability as it applies to passive sellers, while ensuring that a person injured by a

defective product can recover from a viable source."  In re Shigellosis Litig., 647

N.W.2d 1, 6 (Minn. Ct. App. 2002).  However, "[d]ismissal is not appropriate if

the plaintiff's action cannot reach a manufacturer or the manufacturer is

insolvent."  Id. at 7 (citation omitted).

Even if the plaintiff is unable to show that the manufacturer cannot satisfy

any judgment, the Court still cannot dismiss the non-manufacturer if the plaintiff

shows

> a) that the defendant has exercised some significant control over the
> design or manufacture of the product, or has provided instructions
> or warnings to the manufacturer relative to the alleged defect in the
> product which caused the injury, death or damage;

> (b) that the defendant had actual knowledge of the defect in the
> product which caused the injury, death or damage; or

> (c) that the defendant created the defect in the product which caused

the injury, death or damage.

Minn Stat. § 544.41, subd. 3.

### b.    Hunter's View's Insolvency

Wal-Mart claims that Plaintiffs have failed to show that Hunter's View is

unable to satisfy a judgment or potential settlement.  Wal-Mart argues that,

because Hunter's View possess an insurance policy providing liability coverage,

the company is still able to satisfy any judgment against it.  Wal-Mart provides

no evidence of the details of this liability coverage or proof that the insurance

coverage would apply in this case.

Based on the facts in the record, the Court concludes that Plaintiffs have

shown that Hunter's View is unable to satisfy any judgment against it.  As the

Shigellosis court noted, "[d]ismissal is not appropriate if . . . the manufacturer is

insolvent."  647 N.W.2d at 7.  Hunter's View's is in Chapter 7 bankruptcy: it is

insolvent and, unlike a Chapter 11 bankruptcy, a Chapter 7 bankruptcy results in

liquidation.   See Marcon v. Kmart Corp., 573 N.W.2d 728, 731 (Minn. 1998)

(holding non-manufacturer strictly liable for injuries caused by the sale of a

defective product because manufacturer declared bankruptcy before the lawsuit

was brought).  Moreover, even if liability coverage were sufficient to satisfy the

37

statute, Wal-Mart has provided the Court no evidence from which the Court

could make a determination regarding whether any insurance coverage would

satisfy a judgment against Hunter's View.  Wal-Mart's motion for summary

judgment based on § 544.41, subd. 2, is denied.

### c.      Wal-Mart's Role in the Design

Wal-Mart also asserts that none of the three exceptions in subdivision 3

apply because there is no evidence that it was anything other than a passive

seller.

Viewing the facts in the light most favorable to Plaintiffs, there is evidence

that Wal-Mart had a role in the manufacture of the Tree Stand in that Wal-Mart

conducted quality control checks at Hunter's View's Chinese plant.  For example,

Wal-Mart would check the gauge and hardness of the materials being used and

check whether all of the parts were placed into the boxes for shipping.  However,

Plaintiffs have not asserted a manufacturing defect in this case.  Instead, Plaintiffs

claim that the Tree Stand was defectively designed.  There is no evidence that

Wal-Mart was involved in the design of the Tree Stand.  In fact, the evidence

shows that Hunter's View merely copied other companies' tree stands and used

unidentified Chinese engineers to complete its designs.  Because, at most, Wal-

Mart had some control over the manufacturing of the Tree Stand, but only a design defect is alleged, Minnesota Statute § 544.41, subdivision 3(a) does not apply.  See Schweich v. Ziegler, Inc., 463 N.W.2d 722, 731 (Minn. 1990) (holding that, even if the seller had "exercise[d] . . . significant control over the manufacture of the [product]," there was no liability under § 544.41, subdivision 3, when the seller's "modifications did not create the defect causing injury") (citation omitted); see also Leedahl v. Rayco Mfg., Inc., Civil No. 06-310 (JNE/JJG), 2006 WL 1662959, at *2 (D. Minn. May 15, 2006) ("Because [the seller] did not participate in the design of the stump cutter, the only defects for which [the seller] may be potentially liable are manufacturing flaw and failure to warn."), adopted by Civil No. 06-310 (JNE/JJG), 2006 WL 1698645 (D. Minn. June 14, 2006).

There is no evidence that Wal-Mart provided instructions or warnings relative to the alleged defects in the Tree Stand.  Nor is there evidence that Wal-Mart had actual knowledge of the Tree Stand's alleged defects.  Finally, there is no evidence that Wal-Mart created the alleged defects.  None of the factors under § 544.41, subdivision 3, apply to Wal-Mart.

### 4.    Negligence

As the Court has noted, there is no evidence that Wal-Mart had any control over the design of the Tree Stand or provided instructions or warnings related to the alleged defect.  There is no allegation of a manufacturing defect in this case. Therefore, Plaintiffs' negligence claim against Wal-Mart fails.

### 5.    Breach of Warranty Against Wal-Mart

Wal-Mart argues that Plaintiffs have failed to introduce any evidence of express or implied warranties supplied by Wal-Mart regarding the Tree Stand.

There is no evidence of any express statements or representations by Wal-Mart regarding the Tree Stand, and "[s]trict products liability has effectively preempted implied warranty claims where personal injury is involved." Masepohl v. Am. Tobacco Co., Inc., 974 F. Supp. 1245, 1253 (D. Minn. 1997) (citations omitted).  Plaintiffs' breach of warranty claim against Wal-Mart is dismissed.

### 6.    Statute of Limitations for Breach of Warranty

Hunter's View argues that Plaintiffs' breach of warranty claim is time-barred.  Minnesota Statute § 336.2-725, subdivision 1, provides that "[a]n action for breach of contract for sale must be commenced within four years after the cause of action has accrued."  "A cause of action accrues when the breach

occurs, regardless of the aggrieved party's lack of knowledge of the breach.  A

breach of warranty occurs when tender of delivery is made . . ."  Minn. Stat.

§ 336.2-725, subd. 2.

Finke testified that he bought the Tree Stand in July or August of 2002.

Based on the record before the Court, this lawsuit commenced in September 2007.

According to Hunter's View, the original lawsuit commenced in July 2007.

Plaintiffs have not addressed the statute of limitations issue.  However, even

taking the earlier date set forth by Hunter's View, this lawsuit began more than

four years after August 2002, and Plaintiffs' breach of warranty claim must be

dismissed.

### 7.      Remaining Motions for Summary Judgment

The Court has limited some of the testimony of the proposed expert

witnesses, but it has not wholly excluded any of the proposed witnesses.  None

of the parties are entitled to summary judgment based on the Court's resolution

of their various <u>Daubert</u> motions.

Accordingly, based upon the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED**:

1.      Plaintiffs' Motion to Exclude Experts L.J. Smith and Nathan Dorris and for Partial Summary Judgment [Docket No. 35] is **GRANTED IN PART** and **DENIED IN PART** as follows: The expert testimony of Nathan Dorris, Gary Bakken, and Lorne Smith, Jr., is limited as set forth above in the Memorandum of Law.

2.      Defendant Wal-Mart Stores, Incorporated's Motion for Summary Judgment [Docket No. 39] is **GRANTED IN PART** and **DENIED IN PART** as follows:

      a.      Count One: Strict Liability, as to Wal-Mart, **REMAINS**.

      b.      Count Two: Negligence, as to Wal-Mart, is **DISMISSED**.

      c.      Count Three: Breach of Warranty, as to Wal-Mart, is **DISMISSED**.

      d.      The expert testimony of Thomas Crane and Carol Pollack-Nelson is limited as set forth above in the Memorandum of Law.

3.      Defendant Hunter's View, Ltd.'s Motion to Exclude Certain Expert Testimony and for Summary Judgment [Docket No. 46] is **GRANTED IN PART** and **DENIED IN PART** as follows:

      a.      The expert testimony of Thomas Crane and Carol Pollack-Nelson is limited as set forth above in the Memorandum of Law.

      b.      Count Three: Breach of Warranty, as to Hunter's View, is **DISMISSED**.

Dated:   February 3, 2009                    s/ Michael J. Davis
                                             Michael J. Davis
                                             Chief Judge
                                             United States District Court